**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAMSUNG ELECTRONICS CO, LTD,                    No   C-00-4524 VRW

      Plaintiff,

      v                                        ORDER

QUANTA COMPUTER, INC et al,

      Defendants.

_____/


      Samsung Electronics Co, Ltd (Samsung) filed this action November 13, 2000, against Quanta Computer, Inc (Quanta) and Compal Electronics, Inc (Compal), alleging infringement of six patents relating to keyboard-input processing for ISA-compatible personal computers.  Following the dismissal of various claims, only United States Patent No 5,333,273 remains at issue.

//

//

//

//

**United States District Court**
For the Northern District of California

Defendants have moved for summary judgment of invalidity and non-infringement with respect to the '273 patent and to exclude certain opinions of plaintiff's expert, Dr Robert G Wedig.  For reasons discussed below, defendants' motion for summary judgment of invalidity is DENIED, defendants' motions for summary judgment of non-infringement is GRANTED in part and DENIED in part and defendants' motion to exclude certain opinions of plaintiff's expert is GRANTED in part and DENIED in part.

I

The '273 patent, entitled "protected hot key function for microprocessor-based computer system," issued on July 26, 1994, to inventors Charles Raasch and David Goodman from an application filed September 3, 1992, which was a continuation of an application originally filed on November 9, 1990.  This patent was originally assigned to AST Research, Inc, which subsequently assigned the patent to Samsung on April 21, 1999.

The technology discussed in the '273 patent relates to the field of computer circuitry and, more particularly, keyboard-input processing for ISA-compatible personal computers.  As the '273 patent explains, activity on ISA-compatible computers typically proceeds via an "interrupt," which causes the computer's CPU to stop one activity and start another.  Various interrupts (conventionally labeled in ISA-compatible computers as IRQ0, IRQ1, IRQ2 and so on) are associated with various functions.  Conventionally, the "IRQ1" interrupt is associated with keyboard input; when the CPU receives an IRQ1 interrupt, it stops its activity to receive a "scan code" from the keyboard.  This scan

code signifies that a certain key has been depressed or released, and the CPU will then execute software instructions in response to the particular scan code.  Such software instructions are specific to the software that a user has loaded onto the computer.  For example, pressing the "A" key on the keyboard while running a word processing program will, typically, cause the letter "a" to appear in the active document.  Less intuitively, particular keys or key combinations call up a program or perform a certain function; these are often known as "hot keys."  Application programs may contain a number of hot key functions.  Furthermore, so-called terminate and stay resident (TSR) programs provide a number of useful functions to the computer user.  Because TSR programs typically run in the background and include a number of hot keys, utilization of hot keys assigned a different function in a running application may set up a conflict that interferes with the programs.  The resulting conflict can cause the computer not to function in the way the user expects.

        The patent is directed to a "protected hot key function" whose behavior is not as readily altered or customized by user-loaded software as conventional hot keys.  The invention describes an "additional function key," which, when depressed on its own or in combination with a conventional key or keys, causes a second interrupt — i e, an interrupt other than the IRQ1 interrupt conventionally used in ISA-compatible computers.  Apparently, at the time of the invention, little if any software existed that would respond to this second interrupt, thus ensuring that computer manufacturers could reliably assign predictable behaviors to hot keys using the additional function key (or to the additional

function key on its own) without interference from user-loaded software.

II

The summary judgment standard is the same in a patent case as in any other case.  Union Carbide Corp v American Can Co, 724 F2d 1567, 1571 (Fed Cir 1984).  In reviewing a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v Liberty Lobby, 477 US 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.  And the burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp v Catrett, 477 US 317, 322-23 (1986).  When the moving party has the burden of proof on an issue, the party's showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.  Calderone v United States, 799 F2d 254, 258-59 (6th Cir 1986).  Summary judgment is granted only if the moving party is entitled to judgment as a matter of law.  FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence supporting its claim that a genuine issue of material fact exists.  TW Elec Serv v Pacific Elec Contractors Ass'n, 809 F2d 626, 630 (9th Cir

4

United States District Court

For the Northern District of California

1987).   The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor."   <u>Anderson</u>, 477 US at 255.   "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   Id at 249.

### III

The first issue before the court is whether Samsung's '273 patent is valid.   Defendants' joint motion for summary judgment of invalidity contends that two prior art references anticipate or render obvious the claims contained in the '273 patent.   For the following reasons, the court DENIES defendants' motion for summary judgment of invalidity.

### A

A party seeking to invalidate a patent must overcome a presumption that the patent is valid.   35 USC § 282; <u>United States Gypsum Co v National Gypsum Co</u>, 74 F3d 1209, 1212 (Fed Cir 1996); <u>Hybritech, Inc v Monoclonal Antibodies, Inc</u>, 802 F2d 1367, 1375 (Fed Cir 1986).   This presumption places the burden on the challenging party to prove the patent's invalidity by clear and convincing evidence.   <u>United States Gypsum Co</u>, 74 F3d at 1212. In order to prevail on its motion, therefore, defendants must show that no reasonable jury could find that the evidence of anticipation was less than clear and convincing.

Invalidation of a patent on the ground that it was anticipated by prior art requires a finding that "all of the

United States District Court

For the Northern District of California

elements and limitations of the claim are found within a single prior art reference."  Scripps Clinic & Research Fdn v Genentech, Inc, 927 F2d 1565, 1576 (Fed Cir 1991).  If there is a genuine issue of material fact relevant to any one of these elements, summary judgment is not proper.  See Helefix, 208 F3d at 1346.

Even if a prior art fails to anticipate the patent, it still may render it obvious.  Section 103(a) of the Patent Act states that "[a] patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would at the time of the invention have been obvious to a person having ordinary skill in the art."  See KAO Corp v Unilever US, Inc, 441 F3d 963, 968 (Fed Cir 2006).  Obviousness is a legal determination based on the following factual inquiries:  (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of non-obviousness, such as commercial success, long-felt but unsolved need, failure of others, copying, and unexpected results.  See McNeil-PPC, Inc v L Perrigo Co, 337 F.3d 1362, 1368 (Fed Cir 2003) (citing Graham v. John Deere Co, 383 US 1, 17 (1966)).

The analysis under 35 USC § 103 requires the "oft-difficult but critical step of casting the mind back to the time of the invention, to consider the thinking of one of ordinary skill in the art, guided only by the prior art references and the then-accepted wisdom in the field."  In re Dembiczak, 175 F3d 994, 999 (Fed Cir 1999).  That is, courts "cannot use hindsight reconstruction to pick and choose among isolated disclosures in the

6

**United States District Court**
For the Northern District of California

prior art to deprecate the claimed invention." <u>Ecolochem, Inc v S
Cal Edison Co</u>, 227 F.3d 1361, 1371 (Fed Cir 2000) (quoting <u>In re
Fine</u>, 837 F2d 1071, 1075 (Fed Cir 1988)).

To avoid hindsight-based obviousness analysis, the
Federal Circuit requires "a rigorous application of the requirement
for a showing of a teaching or motivation to combine the prior art
references." Id. Accordingly, to prove obviousness, it is
insufficient to demonstrate that the separate elements of the
invention existed in the prior art. Rather, there must be some
suggestion, motivation, or teaching in the prior art that would
have led a person of ordinary skill in the art to select the
references and combine them in a way that would produce the claimed
invention. <u>Karsten Mfg Corp v Cleveland Golf Corp</u>, 242 F3d 1376,
1385 (Fed Cir 2001). Moreover, this showing of a suggestion,
teaching or motivation to combine references "must be clear and
particular." <u>In re Dembiczak</u>, 175 F3d at 999.

Finally, an alleged infringer seeking to invalidate a
patent on obviousness grounds must establish its obviousness by
facts supported by clear and convincing evidence. <u>KAO Corp</u>, 441
F3d at 968 (citing <u>Apotex USA, Inc v Merck & Co</u>, 254 F3d 1031, 1036
(Fed Cir 2001)).


                                    B

Defendants first offer as prior art an IBM manual
entitled "IBM PC Convertible Technical Reference" volume 1 and 2.
It is undisputed that this manual constitutes prior art under 35
USC § 102(b), as it was published and bears a copyright date of
February 1986, well more than a year before the earliest effective

United States District Court

For the Northern District of California

filing dates of the '273 patent, November 9, 1990.  Doc #347, Dang decl, Ex C.  The manual describes a computer — the IBM PC Convertible — that allegedly anticipates or renders obvious the '273 patent.  Doc #345 at 5.  In particular, the IBM PC Convertible is said to provide built-in functions that are invoked in response to users pressing the Fn key in combination with other keys.  Id.

A second allegedly invalidating computer system is described in United State Patent Number 5,560,024 (the '024 reference or Harper Patent), which is entitled "Computer Power Management Systems."  Doc #347, Dang decl, Ex E.  Defendants argue that the '024 reference anticipates or renders obvious each limitation of claims 5, 6 and 7 and renders obvious claims 1, 3 and 4.  Doc #345 at 18.  The '024 reference has an earliest effective filing date of June 30, 1989, and thus is prior art under 35 USC § 102(e) and for obviousness under § 103(a) as of that date.  Doc #347, Dang decl, Ex E.  The '024 reference describes an IBM-based portable computer comprising a keyboard with conventional keys and an additional function key called the "Poqet key."  Id, Ex E at 21:53-60.  Pressing the "Poqet key" in combination with other keys would trigger various built-in functions.  Id.

Samsung contends that the IBM manual and the '024 Reference do not anticipate the '273 patent because they are not "ISA-compatible," as required by all of the claims.  Doc #379 at 5. Because the court agrees with Samsung for the following reasons, the court declines to address Samsung's alternative arguments in opposition to anticipation.

All of the claims contained in the '273 patent limit the scope of the invention to computer systems that are "ISA-

United States District Court

For the Northern District of California

compatible." See '273 patent at col 13-14. Samsung contends that neither pieces of prior art adopt this design standard; therefore, they cannot anticipate any claims of the '273 patent.

The parties do not dispute the underlying structure of the computer systems described by the prior art: they both can handle 8 of the 16 ISA standard defined interrupts, that is, the IRQ0-IRQ7 signals but not the IRQ8-IRQ15 signals. Doc #366, Lim decl, Ex E, ¶ 13; Doc #381, Wedig decl, ¶ 6. The point of contention, then, is whether partial capability satisfies the "ISA-compatible" limitation.

In its <u>Markman</u> order, the court adopted the Texas court's prior construction, which defined the term "ISA-compatible" to be "a computer that can handle ISA standard defined interrupts." Doc #227 at 10. During these proceedings, Samsung had asked the court to add the clarification that "[n]ot all ISA standard defined interrupts need to be used in an ISA-compatible computer." Id at 9. The court rejected Samsung's proposed clarification, excluding it from the court's construction, but noted that "some interrupts might not be used in a given computer." Id.

Defendants rely on this exchange to argue that the IBM PC Convertible and Poqet PC are ISA-compatible because the limitation does not require it to "use" all of the interrupts. Doc #345 at 15. But this argument conflates "use" with physical capability. The claim limitation requires that the computers "can handle" ISA defined interrupts. Yet the IBM PC Convertible and Poqet PC not only fail to "use" IRQ8-IRQ15 signals, they are physically incapable of handling them.

Defendants' alternative argument reveals a possible

**United States District Court**

For the Northern District of California

ambiguity in the court's claim construction.  The IBM PC
Convertible and Poqet PC can handle IRQ0-IRQ7, which are "ISA
standard defined interrupts;" therefore, defendants argue, the IBM
PC Convertible and Poqet PC "can handle ISA standard defined
interrupts."  Doc #386 at 1.  Yet defendants' syllogism can work
both ways:  the IBM PC Convertible and Poqet PC cannot handle IRQ8-
IRQ15, which are "ISA standard defined interrupts;" therefore,
these computers can<u>not</u> handle ISA standard defined interrupts.
Either way, it is apparent to the court that it must determine
whether ISA-compatibility requires a computer to be able to handle
only some or all of the ISA standard defined interrupts.

        Both the court's claim construction order and the '273
patent strongly suggest the latter interpretation, i e, that
compatibility requires the ability to handle all of the interrupts.
Although a court generally should not import limitations from the
specification based on disclosed embodiments, "where the
specification makes clear at various points that the claimed
invention is narrower than the claim language might imply, it is
entirely permissible and proper to limit the claims."  <u>Alloc, Inc v
ITC</u>, 342 F3d 1361, 1370 (Fed Cir 2003) (internal citations
omitted).  Here, the specification repeatedly indicates that the
invention deals with computers that can handle all 16 interrupts,
thereby permitting a claim limitation to be inferred.  See, e g,
'273 patent at abstract ("a second interrupt different from the
IRQ1 interrupt is activated (e.g., IRQ15)"); id at col 1:17-20
("The Industry Standard Architecture (ISA) was developed by IBM
corporation for use in its AT-type computers and defines an
architectural environment for computers that utilize an Intel 80x86

10

microprocessor"); id at col 4:31-34 ("The interrupt controller has a plurality of interrupt lines IRQ0 through IRQ15"); id at col 6:38-45 ("[the] keyboard controller is responsive to scan codes * * * to generate an interrupt requires signal IRQ15 * * *.  The IRQ15 signal line is typically not used on conventional ISA compatible computers and is thus available for use with the thirteenth function key Fn"); id at col 8:34-36 ("If the function key is still active, the keyboard microprocessor actives the IRQ15 signal"); id at col 8:68-9:2 ("The keyboard controller provides an IRQ1 output signal on a line and an IRQ12 signal on a line").

Accordingly, the term "ISA-compatible" in the '273 patent requires a computer to be able to handle all of the ISA standard defined interrupts.  Hence, the IBM PC Convertible and the Poqet PC are not "ISA-compatible," and consequently do not anticipate the '273 patent.

Samsung also argues that neither the IBM PC Convertible nor the Poqet PC perform the functions of the "keyboard controller" as required by the claims in the '273 patent.  Doc #379 at 12, 18. This argument derives from the requirement in claims 1, 3 and 4 that the keyboard controller generate the "first interrupt signal" when a conventional key is pressed and the "second interrupt signal" when the additional function key is pressed in combination with an alphanumeric key and the requirement in claims 5 and 7 that the keyboard controller generate the "first interrupt signal" when a conventional key is pressed and the "second interrupt signal" when at least the non-conventional function key is pressed.  Id.

It is undisputed that the IBM PC Convertible keyboard controller generates the NMI signal both when a conventional key is

United States District Court

For the Northern District of California

pressed and when the Fn key is pressed in combination with a
conventional key.  Lim decl, Ex G at 219-21; Wedig decl, ¶ 26-27.
Likewise, the keyboard controller used in the Poqet PC does not
have the ability to distinguish between pressing individual
conventional keys and pressing key combinations or the additional
function key because it generates both a NMI signal and an IRQ1
signal every time a conventional key is pressed.  Lim decl, Ex G at
171-73; Wedig decl, ¶ 31-32.  This distinction further supports the
court's conclusion that the IBM PC Convertible and Poqet PC do not
anticipate the '273 patent.

C

Defendants argue in the alternative that the IBM PC
Manual and the '024 reference independently and together render the
asserted claims obvious, although they allocate few words to this
portion of their briefing.  In essence, defendants argue that the
prior art, if not anticipatory, is close enough to render the
claims obvious.

Proving that an invention is obvious, however, requires a
far more rigorous analysis involving material issues of fact than
that presented by defendants.  As outlined by the Supreme Court in
Graham v John Deere Co, 383 US 1, 17-18 (1966), the following
factual inquiries must be answered prior to any conclusions
regarding obviousness:  (1) the scope and content of the prior art;
(2) the differences between the prior art and the claims at issue;
(3) the level of ordinary skill in the art at the time the
invention was made; and (4) objective evidence of non-obviousness.
While defendants impliedly address the first three

**United States District Court**

For the Northern District of California

factors in the course of their discussion of anticipation, they completely fail to discuss the last element concerning the existence of objective evidence of non-obviousness, such as evidence of the patented item's commercial success.  <u>Custom Accessories, Inc v Jeffrey-Allen Industries, Inc</u>, 807 F2d 955, 960 (Fed Cir 1986).  Yet the Federal Circuit has repeatedly held that objective evidence of non-obviousness must be taken into account.  <u>See Hybritech v Monoclonal Antibodies, Inc</u>, 802 F2d 1367 (Fed Cir 1986); <u>Bausch & Lomb, Inc. v Barnes-Hind Inc</u>, 796 F2d 443 (Fed Cir 1986).

Accordingly, defendants have failed to provide clear and convincing evidence that the IBM PC Manual and the '024 reference independently and together render obvious the claims contained in the '273 patent.

IV

Both Compal and Quanta have filed separate motions for summary judgment of non-infringement.  See Doc ##341, 359.  Because the defendants advance nearly identical arguments, the court addresses these two motions together under this heading.

A

Under section 271 of the Patent Act, 35 USC § 271, liability for patent infringement may be imposed on any person who without permission of the patentee "makes, uses, offers to sell, or sells any patented invention[] within the United States or imports into the United States any patented invention during the term of the patent therefor."  Id.  The rights granted to the patentee are

United States District Court

For the Northern District of California

defined by the patent's claims.  Markman v Westview Instruments, Inc, 517 US 370, 373 (1996).  In determining whether an allegedly infringing device falls within the scope of the claims, a two-step process is used:  first, the court must determine as a matter of law the meaning of the particular claim or claims at issue; and second, it must consider whether the accused product infringes one or more of the properly construed claims.  Id at 384.  The second inquiry is a question of fact, although summary judgment of infringement or non-infringement may nonetheless be appropriate when no genuine dispute of material fact exists.  Irdeto Access, Inc v Echostar Satellite Corp, 383 F3d 1295, 1299 (Fed Cir 2004) (quoting Bai v L & L Wings, Inc, 160 F3d 1350, 1353 (Fed Cir 1998)).

The patentee bears the burden of proving infringement by a preponderance of the evidence.  Laitram Corp v Rexnord, Inc, 939 F2d 1533, 1535 (Fed Cir 1991).  This burden can be met by showing that the patent is infringed either literally or under the doctrine of equivalents.  See Linear Tech Corp v Impala Linear Corp, 379 F3d 1311, 1318 (Fed Cir 2004).  To support a finding of literal infringement, the patentee must establish that "every limitation recited in the claim appears in the accused product, i e, the properly construed claim reads on the accused product exactly.  Jeneric/Pentron, Inc v Dillon Co, 205 F3d 1377, 1382 (Fed Cir 2000) (citing Amhil Enters Ltd v Wawa, Inc, 81 F3d 1554, 1562 (Fed Cir 1996)).  Alternatively, where one or more elements of the claim are not literally present in the allegedly infringing product or process, infringement may nonetheless be found under the doctrine of equivalence if the differences between the accused device and

United States District Court

For the Northern District of California

the patented invention are "insubstantial."  Honeywell Int'l, Inc v Hamilton Sundstrand Corp, 370 F.3d 1131, 1139 (Fed Cir 2004).  As with literal infringement, this inquiry requires an element-by-element comparison of the patented invention to the accused device.  Warner-Jenkinson Co v Hilton Davis Chem Co, 520 US 17, 40 (1997).  Consequently, in applying the doctrine of equivalents, the court must consider whether the accused device "contain[s] elements that are either identical or equivalent to each claimed element of the patented invention."  Id.

Under the classic formulation of the doctrine of equivalents set forth in Graver Tank & Manufacturing Co v Linde Air Products Co, 339 US 605 (1950), a feature of the accused device is "equivalent" to an element of claimed invention if it performs substantially the same function in substantially the same way to achieve substantially the same result.  Id at 608 (citations omitted); see also Schoell v Regal Mar Indus, Inc, 247 F3d 1202, 1209-10 (Fed Cir 2001).  Yet, as the Supreme Court subsequently acknowledged in Warner-Jenkinson, this particular "linguistic framework" may not be appropriate in every case.  520 US at 39-40.  Rather, the Court observed that "[a]n analysis of the role played by each element in the context of the specific patent claim [must] inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element."  Id at 40.  A number of other considerations may also be relevant in determining the range of equivalents to which the claimed invention is entitled, including the prosecution history of the patent in suit, the pioneer status of the invention (or lack

15

thereof), and the limitations on patentability of the allegedly equivalent device that would have been imposed by prior art extant on the date of invention.  Intel Corp v United States Int'l Trade Comm'n, 946 F2d 821, 842 (Fed Cir 1991).

                                    B

          Although this case concerns whether defendants' accused products infringe independent claims 1 and 5 and dependent claims 3, 4 and 7 of the '273 patent, defendants' summary judgment motions only address independent claims 1 and 5.  They claim as follows:

          1.  A system for providing a built-in function in an ISA-compatible computer in response to activation of a selected combination of user activated keys, comprising:

          a keyboard having a set of conventional alphanumeric and function keys and further having at least one additional function key;

          a keyboard controller connected to said keyboard to monitor said conventional keys and said additional function key to detect when at least one of said keys is activated, said keyboard controller having first and second interrupt signal lines connected to said ISA-compatible computer, said keyboard controller responsive to an activation of at least one of said conventional keys to activate a first interrupt signal to said ISA-compatible computer on said first interrupt signal line, said keyboard controller responsive to an activation of said additional function key in combination with at least one of said conventional alphanumeric keys to generate a second interrupt signal to said ISA-compatible computer on said second interrupt signal line;

          a first conventional interrupt handling routine within said ISA-compatible computer responsive to said first interrupt signal from said keyboard controller to input data scan codes from said keyboard; and

a second non-conventional interrupt handling
routine within said ISA-compatible computer
responsive to said second interrupt signal
from said keyboard controller to input an
identification of said activated
alphanumeric key and to perform a
predetermined function selected by said
identified alphanumeric key.

* * *

5.   A system for servicing keyboard interrupts in an
ISA-compatible computer, comprising:

a keyboard having a plurality of keys including
conventional alphanumeric keys,
conventional symbol keys, conventional
function keys and conventional cursor
control keys, said keyboard further
including at least one non-conventional
function key, said keyboard generating a
scan code in response to an activation of
at least one of said keys, said scan code
varying depending upon which of said keys
is activated; and

a keyboard controller coupled to said keyboard,
said keyboard controller further coupled to
said ISA-compatible computer by first and
second interrupt signal lines, said
keyboard controller generating a first
interrupt signal on said first interrupt
signal line upon receipt of a scan code
corresponding to one of said conventional
keys, said ISA-compatible computer
programmed to execute a program to input
said scan code in response to said first
interrupt signal, said keyboard controller
generating a second interrupt signal on
said second interrupt signal line upon
receipt of a scan code corresponding to
said non-conventional function key, said
ISA-compatible computer programmed to
execute at least one special routine upon
receipt of said second interrupt signal.

1

Defendants first argue that their notebook computers do
not infringe the claims because they do not meet the "keyboard" and

United States District Court

For the Northern District of California

17

**United States District Court**
For the Northern District of California

"keyboard controller" limitations required by independent claims 1 and 5.  Doc #359 at 11; Doc #341 at 6.  Prior to the court's claim construction order, the parties agreed upon the construction of "keyboard" to mean:

> An input apparatus containing internal circuitry to output or generate data scan codes."  Doc #227 at 16.

The parties also agreed that these scan codes are sent to a "keyboard controller" for processing, which then transmits interrupts to the computer.  Id.  Hence, the court construed the term "keyboard controller" to mean:

> A component, electronically or functionally distinct from the keyboard, that activates interrupt signals in response to receipt of data scan codes from the keyboard, and, upon request, transmits data scan codes to the computer.

Both of these definitions incorporate the phrase "data scan codes" — a term the parties hotly disputed in the Markman hearing.  Id at 11-16.  In short, at that hearing, Samsung argued that row and column signals — i e, the electrical signals generated from the grid of wires that underlays the keys of the keyboard — can constitute a scan code; defendants argued that they cannot.  Id at 11.  Ultimately, the court sided with defendants, defining the term as:

> A code number that the keyboard generates whenever a key is depressed or released, said code number created by converting a pairing of a row signal and a column signal in the keyboard matrix.  Id at 16.

As the court noted, this construction order makes clear that "row and column signals [produced by keyboards] are not scan codes."  Doc #227 at 15.

Defendants rely on this prior victory to argue that the accused products do not meet the "keyboard" and "keyboard

United States District Court

For the Northern District of California

controller" claim limitations because they send and receive row signals, not data scan codes. Doc #359 at 11; Doc #341 at 6. But according to Samsung, defendants' argument hinges on an artificial definition of what elements constitute the keyboard and keyboard controller in the accused products. Doc #401 at 7-12. Rather than merely "the keys of on the keyboard matrix," Samsung avers that the keyboard consists of the microprocessor core, the keyboard matrix, the keyboard interface, and specifically identified parts of the Keyboard BIOS. Doc #397 at 7.

In their replies, defendants point out that under Samsung's broad definition, the "keyboard" overlaps with the "keyboard controller." Doc # 407 at 2; Doc # 383 at 1. Indeed, under Dr Wedig's definition, the keyboard controller shares a processor core with the keyboard, which, defendants allege, runs afoul of the court's requirement that the keyboard and the keyboard controller be "electronically or functionally distinct." Id. Samsung claims the two components nonetheless remain electronically and functionally distinct because they share only a single point of integration and the shared processor performs independent software routines for the keyboard and keyboard controller. Doc #397 at 7.

Defendant Quanta characterizes Samsung's argument regarding electronic and functional distinction as "nonsensical," offering the example that "[a]lthough a personal computer can run both Microsoft Word and Internet Explorer, no one would understand the CPU in the computer to contain a functionally distinct word processor connected to a functionally distinct internet browser." Doc #341 at 9. But this analogy, as Samsung points out, suggests precisely the opposite conclusion: everyone understands Microsoft

19

United States District Court

For the Northern District of California

1  Word and Internet Explorer to be functionally distinct, despite

2  their electronic integration.

3          Based on the declarations and technical documents provided

4  by the parties, the court declines to find that the accused products

5  cannot satisfy the keyboard and keyboard controller claim terms as a

6  matter of law.  The court's claim construction defined keyboard and

7  keyboard controller by their function, not their structure. Indeed,

8  the lone structural limitation is that the two components be

9  electronically or functionally distinct.  And at this point,

10 defendants have not convincingly demonstrated that for the keyboard

11 and keyboard controller to share a microprocessor core necessarily

12 renders them electronically and functionally indistinct.

13

14                                  **2**

15          Next, Defendants argue that the accused notebook computers

16 do not satisfy claim 1's requirement that:

17          said keyboard controller responsive to an activation of
         said additional function key in combination with <u>at least</u>
18       <u>one of said conventional alphanumeric keys</u> to generate a
         second interrupt signal to said ISA-compatible computer
19       (emphasis addeed)

20

21 Defendants allege that none of the accused computers, when sold with

22 the relevant operating systems, utilizes hot key combinations of the

23 Fn key and an alphanumeric key.  Samsung disputes this allegation,

    but only with respect to some of the accused products.  For
24
    defendant Compal's products, Samsung alleges that Compal's own Rule
25
    30(b)(6) witness has testified that three of its products utilize
26
    hot key combinations of the Fn key and an alphanumeric key.  See Doc
27
28 #366 (Lim decl), Ex F at 188-89 (regarding model 38W2); Id at 45-49

United States District Court

For the Northern District of California

(model 31I5); Id at 138-53 (models 32T5 and 32T6).  Moreover, according to Samsung, these admissions extend to five products with identical specifications.  Doc #361 (Liu decl), ¶ 60 (model 38W3), 13 (models 31I3 and 31I4) and 27 (models 32T5 and 32T6).  With respect to defendant Quanta, Samsung offers Dr Wedig's testimony that 10 of its products use alphanumeric keys in combination with a function key to generate the second interrupt signal.  See Doc #381, Wedig decl, ¶ 9-20.

Otherwise it appears undisputed that the 31 of Compal's accused products and 22 of Quanta's accused products use key combinations of the Fn key together with keys other than alphanumeric keys to activate hotkey functions.  As a result, for these products, Samsung's theory of liability under claims 1, 3 and 4 is the doctrine of equivalents.

Defendants contend that Samsung cannot rely on the doctrine of equivalents because doing so would vitiate the "alphanumeric key" limitation.  Doc # 401 at 7.  Defendants cite Sage Prod, Inc v Devon Indus, Inc, 126 F3d 1420 (Fed Cir 1997) for the proposition that when a patentee includes a specific claim term that provides a binary choice, it cannot later walk away from that by relying on the doctrine of equivalents.  Id.  Samsung argues that the term alphanumeric is not binary in nature because a number of conventional keys are not its opposite, such as the function key, cursor key, shift key, or control key.  Doc #401 at 18.

Despite the attention the parties paid to these arguments at the hearing on the present motions, the court finds neither side's position convincing.  Defendants' reasoning, as Samsung notes, has no principled limit:  one could always add the prefix

21

United States District Court

For the Northern District of California

1  "non" to a claim term and argue that anything that is "non-[claim

2  term]" vitiates the claim limitation.  Hence, the doctrine of

3  equivalents is not barred whenever a term is capable of being

4  negated.  But Samsung's reasoning has a similar flaw.  To prove that

5  a term is not binary, it invokes the <u>components</u> of the term's

6  opposite.  Yet most binary relationships have components.  For

7  example, whether a number is odd or even is not rendered non-binary

8  by the number seven.

9          In any event, it is apparent to the court that the

10  parties' arguments here are besides the point.  Under Federal

11  Circuit case law, a term need not be "binary" to implicate the

12  vitiation rule for the doctrine of equivalents.  A patent claim is

13  accorded limited recourse to the doctrine of equivalents if the

14  degree of specification clearly excludes "distinctly different <u>or</u>

15  even opposite" subject matter.  <u>BioCon v The Straumann Company</u>, 05-

16  1168, (Fed Cir 2006) (emphasis added).  Hence, for claims limited to

17  "alphanumeric keys," the court need not conclude that the term "non-

18  alphanumeric" is a binary opposite, only that it is "distinctly

19  different."  And under that standard, the court finds that claim 1

20  clearly excludes non-alphanumeric keys, as they are distinctly

21  different from alphanumeric keys.  Samsung is consequently barred

22  from asserting infringement of claims 1, 3 and 4 under the doctrine

23  of equivalents for the defendants' products that use key

24  combinations of the Fn key together with keys other than

25  alphanumeric keys to activate hotkey functions.

26

27                                 3

28          Finally, defendants argue that the accused notebook

computers fall outside of claim 5's requirement that the "keyboard controller [generate] a second interrupt signal on said second interrupt signal line upon receipt of a scan code corresponding to said non-conventional function key." '273 Patent at col 14:42-45. The court declined to construe this requirement, but noted that receipt of the scan code alone is not a necessary condition; that is, claim 5 could read, inter alia, on a function key alone and a function key in combination with a conventional key.  Doc #227 at 23.

Defendants suggest that the court's claim construction order identifies only one other "scenario" in which claim 5 is infringed.  Doc #359 at 22.  In doing so, defendants create a claim limitation out the court's unwillingness to adopt their proposed construction.  In the order, to refute the defendants' proposal, the court identified a sample embodiment that would be covered by the term but would fall outside of the proposal.  Improbably, defendants now present this example as the exclusive exception.  Doc #359 at 22.  Moreover, defendants further narrow this exception by adding in language spliced from a parenthetical in the court's order.  Id. The court finds defendants' interpretation of the claim construction order inappropriate, especially for claim language on which the court concluded it was "unable to improve."  Doc #227 at 23.

Defendants remaining argument on this point falls due this first misstep.  Because the example in the court's construction does not constitute a claim limitation, defendants' argument regarding claim 5 is not an adequate basis for summary judgment of non-

infringement.


V

Finally, the court addresses defendants' motion to exclude the opinions of Dr Wedig regarding the '273 patent's conception, reduction to practice and commercial success.  Doc #343.  Defendants argue that Dr Wedig's expert testimony is not admissible because he is not qualified to opine on these issues and his opinions are not adequately supported.  Id.  Moreover, regarding the '273 patent's reduction to practice, defendants add that Dr Wedig applied an incorrect legal standard.  Id at 12-13.  For the following reasons, defendants' motion to exclude is GRANTED IN PART and DENIED IN PART.


A

In determining whether to admit an expert's testimony, a district court must ensure that the testimony is reliable — i e, is based on scientific, technical or other specialized knowledge — and relevant — i e, will assist the trier of fact.  Daubert v Merrell Dow Pharms, Inc, 509 US 579, 589-91 (1993); FRE 702.  To satisfy the reliability requirement, the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that his opinion is adequately supported.  Daubert, 509 US at 589-90.  Expert testimony is not admissible if it is speculative, unsupported by sufficient facts or contrary to the facts of the case.  See General Electric v Joiner, 522 US 136, 146 (1997) (holding that courts should not admit expert

testimony that "is connected to existing data only by the ipse dixit of the expert").

B

Defendants do not dispute the relevance of Dr Wedig's testimony but only argue that his testimony is not reliable.  Doc #343 at 1.  First, defendants argue that Dr Wedig, due to his lack of legal training, is not qualified to opine on the legal issues of conception and reduction to practice.  Doc #343 at 5 (citing Hybritech Inc v Monoclonal Antibodies, Inc, 802 F2d 1367, 1376 (Fed Cir 1986)).  The court agrees.  An expert's opinion on the ultimate legal conclusion is "neither required nor indeed 'evidence' at all." Mendenhall v Cedarapids, 5 F3d 1557, 1574 (Fed Cir 1993) (quoting Avia Group Int'l, Inc v LA Gear Cal, Inc, 853 F2d 1557, 1564 (Fed Cir 1988)).

Yet that does not justify a wholesale exclusion of Dr Wedig's testimony on these issues, despite defendants' argument to the contrary.  At the hearing on the present motions, defendants put much weight on the case Price v Symsek, 988 F.2d 1187 (Fed Cir 1993) But in doing so, defendants confuse the burden of proof with the admissibility standard under FRE 702.  Price holds that an inventor's testimony requires corroboration to prove conception.  Id at 1194.  But to be admissible, the opinion of an expert need not be conclusive proof.  Indeed, parties often offer multiple sources of evidence that, in aggregate, prove a proposition even though no source independently suffices.

Accordingly, the court only excludes Dr Wedig's legal conclusions.  It is plain from paragraphs 20 and 21 of Dr Wedig's rebuttal report, Doc #344, Mingrone Decl, Ex 7, that he is

United States District Court

For the Northern District of California

attempting to use the legal definitions of conception and reduction to practice.  See, e g, id at 11 ("I understand that the date of conception is defined as the date at which the inventor has a formulation of the complete means of solving a problem in such a way that a person of ordinary skill in the art could practice the invention without unduly extensive research or experimentation").  In four parts of his rebuttal report, Dr Wedig applies these legal standards to offer legal conclusions regarding the invention's conception and reduction to practice.  Dr Wedig may rely on the technical record to estimate when the inventors thought of the invention and when the invention became operational, but he may not opine on when the invention was legally conceived and reduced to practice.  Accordingly, the court excludes the following parts of Dr Wedig's rebuttal report in which he states legal conclusions about the '273 patent's conception and reduction to practice:  (1) the first sentence of paragraph 24, (2) the fifth sentence of paragraph 29, (3) the fourth sentence of paragraph 30, and (4) paragraph 31 in its entirety.  Id.

Second, defendants argue that Dr Wedig's testimony on conception and reduction to practice is not adequately supported and therefore not admissible.  Doc #343 at 8.  The court disagrees.

In opining on these issues, Dr Wedig relied on Michael Goodman's day planner and the deposition testimony of two inventors and two engineers.  Doc #344, Ex 7 ¶19.  Without question, Dr Wedig, as a computer scientist, is qualified to review the technical contents of Goodman's day planner, Doc #350, Corrected Jones Decl, Ex 11; Doc #368, Noll Decl, Ex C, and provide his opinions on them.  This means that categorical exclusion of his opinions will risk

1   depriving the jury of potentially useful expert assistance in

2   understanding an important piece of evidence.

3

4                                    C

5           Defendants essentially repeat their arguments with respect

6   to the '273 patent's commercial success.  That is, Dr Wedig is not

7   qualified to opine on the issue and his opinions are not supported.

8   Doc #343 at 14-15.  The court finds neither of these arguments

9   persuasive.

10          At issue is Dr Wedig's single paragraph testimony,

11  appearing in his rebuttal report.  Doc #344, Ex 7 ¶75.  Defendants

12  appear to argue that this paragraph is not admissible because it

13  fails to "establish" or "demonstrate a nexus between the claimed

14  sales and the merits of the invention."  Doc #343 at 14 (citing

15  Kansas Jack, Inc v Kuhn, 719 F2d 1144, 1150-51 (Fed Cir 1983)).  The

16  case defendants cite, Kansas, held that the number of units sold

17  alone is not sufficient to demonstrate the product's commercial

18  success.  719 F2d at 1150-51.  But again, this case has no bearing

19  on the admissibility of expert testimony.  Dr Wedig's testimony need

20  not "establish" commercial success for his testimony to be

21  admissible; it only need be relevant and reliable.  FRE 702.

22          Dr Wedig opines in the paragraph at issue that the '273

23  patent "has been widely implemented in numerous notebook computers

24  [he] ha[s] personally analyzed."  Doc #344, Ex 7 ¶75.  An

25  invention's widespread use is probative to the commercial success of

26  the invention.  See Kansas, 719 F2d at 1151 (holding that an

27  invention's market share is one of the factors the court may

28  consider in evaluating the invention's commercial success).

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In opining on the widespread implementation of the '273 patent in notebook computers, Dr Wedig is relying on his personal experience of analyzing a large number of notebook computers.  Doc #344, Ex 7 ¶75.  The court recognizes that Dr Wedig's primary expertise lies in "analysis of computer hardware and software design issues," rather than in analysis of the market for computers.  Doc #344, Ex 7 ¶1.  Yet Dr Wedig's personal experience with a large number of notebook computers is sufficient support to establish the admissibility of his opinion.

**United States District Court**

For the Northern District of California

# VI

In sum, the court DENIES defendants' summary judgment motion of invalidity, GRANTS defendants' summary judgment motions of non-infringement of claims 1, 3 and 4 of the '273 patent for defendants' products that use key combinations of the Fn key together with keys other than alphanumeric keys and DENIES the remaining portions of defendants' summary judgment motions of non-infringement.  The court also GRANTS defendants' motion to exclude the opinions of Dr Robert G Wedig with respect to his legal conclusions, but DENIES defendants' motion to exclude his opinions regarding the technology's commercial success.

The remaining issues in this case are:  (1) whether the accused products that use key combinations of the Fn key together with alphanumeric keys infringe, either literally or under the doctrine of equivalents, claims 1, 3 and 4 and (2) whether the accused products infringe, either literally or under the doctrine of equivalents, claims 5 and 7.

IT IS SO ORDERED.

_____

VAUGHN R WALKER

United States District Chief Judge